UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRANDI WETHERALD, individually and )
as Parent and Next Friend of C.W., )
)
Plaintiff, )
)
v. ) No. 1:19-cv-00003-DML-JPH
)
CARMEL CLAY SCHOOL CORPORATION )
and )
CARMEL CLAY BOARD OF SCHOOL )
TRUSTEES, )
)
Defendants. )

## Order on Cross-Motions for Summary Judgment

This matter is before the court on cross-motions for summary judgment by

plaintiff Brandi Wetherald, on behalf of herself and her child, C.W. ("Child"), and

defendants Carmel Clay School Corporation and the Carmel Clay Board of School

Trustees (collectively, the "School"). The dispute involves an independent hearing

officer's decision rendered after a Section 7 administrative hearing that was

conducted over five days. The administrative record consists of about 3,400 pages.

The hearing officer's decision, entered December 7, 2018, determined that the

School, in violation of the Individuals with Disabilities Education Act (29 U.S.C. §

1400 *et seq.*), had not provided Child with a Free Appropriate Public Education

("FAPE") since January 2018, for various reasons. Ms. Wetherald (sometimes

referred to as "Mother") filed this action to recover her attorneys' fees incurred in

connection with the Section 7 hearing and, if she prevails on the merits, fees

incurred in this litigation.  The School filed a counterclaim seeking judicial review and reversal of the hearing officer's decision.

For the reasons addressed below, the court determines that the School has not met its burden to show that the hearing officer's decision is not supported by substantial evidence or is otherwise contrary to law.

## Standard of Review

Although the issues before the court are presented via summary judgment motions, the court acts in an appellate-type role, and "summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. by Kathy S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997).  Pure matters of law are reviewed *de novo*, and the court must afford "due weight" to the hearing officer's factual findings.  *M.B. v. Hamilton Southeastern Sch.,* 668 F.3d 851, 860 (7th Cir. 2011).  The court's standard of review "is equivalent to a 'clear-error' or 'substantial-evidence' standard . . . [and] the party challenging the outcome of the administrative proceedings bears the burden of proof."  *Id.*  In addition, the court should accept the hearing officer's credibility determinations, *i.e.*, the officer's decision to accept some testimony as more worthy of belief than contrary testimony.  *E.g., Shore Reg'l High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3rd Cir. 2004).

## Background

### I.   Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA") requires public schools to "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(4). A state is eligible to receive federal funding to educate children with disabilities if the state meets certain criteria, including providing disabled children with a free appropriate public education (FAPE), in the least restrictive environment, "that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." *Morton Comm. Unit Sch. Dist. No. 709 v. J.M.,* 152 F.3d 583, 584 (7th Cir. 1998) (citing 20 U.S.C. § 1400(d)(1)(A)).  A free appropriate public education "includes both 'special education' and 'related services.'"  Special education is "specially designed instruction . . . to meet the unique needs of a child with a disability"; related services are "support services required to assist a child . . . to benefit from that instruction." *Endrew F. ex rel. Joseph F. v. Douglas City School Dist.,* 137 S. Ct. 988, 993 (2017).  The "blueprint" for a school's delivery of the required special education and related services is the student's "individualized education program," or IEP.  *Id.* at 994  The IEP must be "reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* at 1002.

Under the IDEA, parents are assured an "active and meaningful role in the development or modification of their child's IEP," *Hjortness v. Neenah Joint Sch.*

*Dist.,* 507 F.3d 1060, 1064 (7th Cir. 2007), though they do not have a right to "to compel a school district to provide a specific program or employ a specific methodology in providing for the education" of their child.  *Lachman v. Illinois State Bd. of Education*, 852 F.2d 290, 297 (7th Cir. 1988). In addition, a school is "not required to do more than to provide a program reasonably calculated to be of educational benefit to the child; [the school is] not required to educate the child to his or her highest potential." *Evanston Cmty. Consul. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004).

## II.   <u>Resolution of Evidentiary Objections</u>

Mother has submitted two affidavits to counter what she perceives are mischaracterizations of the administrative record by the School. One is her own affidavit and the other is an affidavit of Dr. Robin Kohli.  The School objects to the court's allowance of that evidence.  Both affidavits are submitted primarily to address "residential placement" issues, a matter at the heart of some issues the hearing officer considered and ruled on.  Mother testified at the administrative hearing and, according to Dr. Kohli's affidavit, Mother's counsel had intended for Dr. Kohli also to testify at the hearing but decided not to call Dr. Kohli.  The submission of additional evidence on judicial review of a hearing officer's decision should be limited to "gaps in the administrative transcript, owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington v. Dep't of*

*Education*, 736 F.3d 773, 790 (1st Cir. 1984), relied on with approval in *Z.F. v. South Harrison Comm. Sch. Corp.,* 2005 WL 2373729 at *19 (S.D. Ind. Sept. 1, 2005) (Hamilton, J.). None of these events is present here, and the court determines that allowing the affidavits would improperly change the character of this court's role from "one of review to a trial de novo." *See Monticello School Dist. v. George L.,* 102 F.3d 895, 901 (7th Cir. 1996). The court therefore disregards the additional affidavits submitted by Mother.

## III.   <u>Factual and Procedural Background</u>[1]

C.W. is a young man who qualifies for special education and related services. He has diagnoses of autism spectrum disorder, anxiety disorder, mood dysregulation disorder, ADHD, and Celiac disease. He also has a rare chromosomal disorder and a mitochondria disorder, has been diagnosed with Lyme disease, and he has suffered numerous concussions. Child sees several medical providers; the majority of those he sees on a regular basis or for "flare-up" situations are within his local community, and he has a comfort level with them. He exhibits conditions consistent with his autism diagnosis, including impaired social abilities and communication skills, increased anxiety, behavioral outbursts, and difficulties with perseverance and transitioning between activities. His other diagnoses also affect his educational performance abilities because of the effects on academic learning, social skills, and behavior control. Despite his difficulties, Child has had a job at

---

[1]    This recitation of facts contains the facts material to the court's analysis for which the hearing officer had evidence.

"No Label at the Table" and has done well with his social interactions working at a Farmer's Market and at a pop-up-shop in a mall.  He can be social, polite, compassionate, and exhibit a sense of humor.  He has been a peer mentor to students with cognitive disabilities and expressed a desire to work with students with disabilities as a career.  Child's Mother is very supportive of him and patient with him.  She has been actively involved in his education and in trying to prepare him for independent living.

During Child's eighth-grade year, beginning August 2015, his IEP placed him in a general education classroom at Carmel Clay Middle School with "push-in" special education supports, *i.e.,* special support provided to him by an aide within the general education classroom.[2]  At the start of ninth grade, in August 2016, Mother withdrew Child from the School and enrolled him in Hope Academy, a public charter school that offers behavioral and cognitive therapies.  Soon after, however, Mother withdrew Child from the charter school and re-enrolled him with the School.  The Child was placed in a self-contained classroom at Carmel High School for students with emotional disabilities. Child was sometimes physically aggressive or engaged in property destruction during this period. In October 2016, Mother filed an Article 7 due process administrative hearing request (action a

---

[2]      As required, the IEP was created by a "case conference committee" (or CCC), the group of people who determine the special education, related services, and placement and setting for the student's education and services, consistent with the provision of a FAPE.  A CCC includes, among others, the child's parents, his general education teacher and special education teacher, and a representative of the school. *See* 34 C.F.R. § 300.321.

parent may take when she disagrees with an IEP), and she and the School negotiated a resolution of that request.  A new IEP placed Child in an intense behavior support day treatment program, which included one-on-one assistance from the School's autism consultant, Jared Piper, a board-certified behavior analyst. Child remained in that setting and program from November 2016 to March 2017. In addition, the School paid for an independent "Comprehensive Psychoeducational Assessment" conducted by Dr. Robin Kohli, who was selected by Mother.

Dr. Kohli's report, dated November 1, 2016, (a) assessed Child's "behavior, emotional concerns, and educational functioning" and (b) made "appropriate recommendations for his emotional and academic needs."  Dr. Kohli's report noted that Mother had reported that her Child "frequently destroys their house in his rages and has broken two TV's in the past year, broken windows, put holes in the wall, flipped the furniture, and in recent months has gotten physical" with Mother. Dr. Kohli also noted Mother's concern that without additional services, her Child "may become involved in the juvenile justice system, which would be further detrimental to his educational progress and behavioral stability."  Dr. Kohli agreed, noting: "In regard to his current placement and services, it would appear that [Child] is at high risk for becoming involved in the juvenile justice system[3] due to

---

[3]     The hearing officer noted that a juvenile court petition was filed after Child was accused in the summer of 2018 of acting inappropriately with an underage girl at a recreational center.  The petition eventually was dismissed, and the hearing officer noted that evidence at the hearing indicated the accusation was "somewhat far-fetched," the accuser "had made false allegations in the past," and the pendency of the juvenile court proceeding caused significant stress to Child and Mother.

his outbursts of aggression, which place peers and staff at risk." In her 2016 report,

Dr. Kohli made several recommendations, including the following:

> It is recommended that [Child] be placed in a residential treatment facility where he can receive on-grounds educational services that are intensive in nature and where clinical and psychiatric services are available to address his emotional and behavioral needs. This placement should either offer ABA [Applied Behavioral Analysis] services or permit an outside autism therapist . . . to work with [Child] 1:1 in the facility. . . .[4]

Child's next placement was Access Behavioral Solutions in Indianapolis,

which provides ABA therapy. The hearing officer noted that "very limited

information" was admitted at the hearing about this placement.

In October 2017, during the annual meeting to revise Child's IEP, the CCC

revised annual goals and reviewed transition planning—discussion of and

implementation of services to assist Child in adapting to independent living

following the cessation of school-provided services after high school. Around this

time, Mother identified Independence Academy in Indianapolis as an appropriate

educational and placement setting for Child; it serves about 30 students, most of

whom have autism. Child began attending half-days at Independence Academy on

January 3, 2018. Mother also filed an Article 7 due process administrative hearing

request.

She and the School negotiated a resolution of that request, convening a

January 19, 2018 CCC, which developed an IEP that placed Child at Independence

---

[4]      ABA therapy is a treatment program used for children with autism. Generally, they receive such therapy 30-40 hours per week in a private center.

Academy, with a one-on-one aide, and required Jared Piper (the School's autism consultant) to work with Child at Independence Academy and to train Independence Academy's staff in working with Child. (Although Mr. Piper was tasked with training the one-on-one aides (there were two, non-overlapping, aides during Child's placement at Independence Academy), the hearing officer noted the absence of information in the record about the training he provided (its length or scope) or the kind of experience, training, and education the aides already possessed). Throughout Child's placement at Independence Academy until sometime in April 2018, Mr. Piper visited Independence Academy once per week to work with Child and supervise and train the one-on-one aide. The School did not know who supervised the one-on-one aide when Mr. Piper was not there; neither the assistant director nor director of Independence Academy was a licensed professional.

The January IEP agreed not to update Child's current goals at that time but to wait until Independence Academy got to know Child better. Mother expressed her concerns about Child's academics and her desire to focus on realistic educational goals and to map out a way for Child to achieve them. The CCC agreed to meet again in 6-8 weeks to determine if the goals were appropriate in the new environment, but a new date was not set.

Child exhibited behavioral problems at Independence Academy. Over the course of time, his behavioral incidents included disrupting the class with talking, disrespecting staff (including calling them names and using profanity), playing

9

games on the computer, throwing pencils and blocks in the classroom, not keeping his hands to himself, knocking over chairs and slamming doors, slamming down books, and acting aggressively in the sensory room by throwing items and hitting walls.  Independence Academy prepared a behavioral log for nearly every day of Child's attendance (the hearing officer found this log, which rated behaviors on a 1-5 scale, to be insufficiently specific about the relative seriousness of the behaviors and vague overall in its application) and prepared separate incident reports for more serious behavior problems, but the incident reports were not shared with Mother.  Mr. Piper, the School's autism specialist, was informed, however, about these reports.

Toward the end of March 2018, emails were exchanged between Mother and Independence Academy and between Mother and the School about behavior problems.  Independence Academy told Mother in a March 20 email that Child was being suspended for "incredibly disrespectful and disruptive" behaviors, and Mother indicated that she wanted everyone to be on the same page about recording Child's behavioral levels. (Mother thought the discipline of Child might be unfair, and his annoying behaviors exaggerated as aggressive ones.)  The following day, Mother and the School had an email exchange about Child; the School suggested convening a CCC, and Mother indicated she was seeking only a meeting to discuss Child's behavioral levels.  The School replied that "we do not have to go through the whole IEP or make it a big 'to do,'" but asked Mother to participate in a case conference committee format to discuss Child's behavior. Mother ultimately agreed and

proposed a date after spring break. The parties scheduled their conference for May 1, 2018.  Before this email exchange, the School had not sought to arrange a CCC following the January 19, 2018 IEP, even though a new conference was supposed to have *occurred* within 6-8 weeks of the January IEP.

In the Spring 2018 while at Independence Academy, Child took ISTEP.  He did not pass any portion of the test, scored significantly below his target scores in all areas of English/Language Arts, Mathematics, and Science, and he did not earn any points on the open-ended items in any category.  Three different teachers provided instruction to Child at Independence Academy, only one of whom maintained a current teaching license; one had never had a teaching license.  The School was not aware of the licensure of the teachers but knew that Independence Academy is state-accredited.  It is accredited as a "freeway" school, which allows flexibility in certain guidelines usually mandated by the Indiana Department of Education.

Initially in January 2018, Child attended Independence Academy in a "probationary period," and attended half-days. It is not clear when the "probationary period" ended, but Child continued to attend only half-days throughout his receipt of services there, even though the January 2018 IEP required 8 hours per day of special education services.  The School did not supplement the services Child received at Independence Academy.

During January 2018, there were 18 instructional days. Of those, Child was absent two days and on two other days, his behavior caused him to be removed from

the classroom. In February, there were 20 instructional days; Child was absent two days, served four days of in-school suspension, served two days of out-of-school suspension, and was removed from the classroom on six other occasions because of behavior.  In March, there were 21 instructional days; Child was absent three days, served three days of in-school suspension and two days of out-of-school suspension, and was removed from the classroom on eight other occasions because of behavior. In April, there were 15 instructional days; Child was absent three days, served one day of in-school suspension and three days of out-of-school suspension, and was removed from the classroom on six occasions where his removal accounted for more than half of classroom time.  Expert testimony at the hearing, credited by the hearing officer, opined that Child's removals from the classroom and suspensions reinforced his negative behaviors because he preferred being removed and sitting in an office instead. The hearing officer also found that the removals and suspensions also interfered with the kind of structured, consistent, and stable environment everyone agreed Child needed for success academically, socially, and behaviorally.

In the interim between the parties' scheduling in late March of a CCC for May 1, the female one-on-one aide who worked with Child reported concerns about him.  On March 28, 2018, she reported to Independence Academy (who relayed the information to the School) that because of Child's behaviors (describing that Child violently swung objects, lashed out at staff, and once tried to staple his fingers with the office stapler), she no longer felt safe being alone with Child.  In response, the School assigned a male as the one-on-one aide, who began working with Child in

mid-April, and required Jared Piper to begin making daily visits to Independence Academy (rather than his previous weekly visits).  In late April, before the scheduled May 1 CCC, Independence Academy dismissed Child from its program, after incidents on April 25, in which Child had broken a table,[5] repeatedly threw a ball at staff, and slapped his one-on-one assistant on the face, the latter in the Mother's presence after she was called to help with Child's behaviors.  Initially, Independence Academy imposed a three-day suspension but then notified the School and Mother, separately, that it had dismissed Child from its program. The parties' scheduled CCC, for May 1, occurred the day after Child's dismissal.

During the May 1, 2018 CCC, the parties developed an interim IEP for immediate services and extended year services ("EYS") over the summer, and for investigation of residential or day placement of Child. The May 1 IEP provided for Child to receive special education services (consisting of academic instruction by teachers and assistance from a one-on-one aide) via Carmel High School Homebound at Carmel Learning Center for three hours/two times per week, and to receive 20 hours of extended school year (ESY) services during the summer, beginning June 1 through August 13.[6]

---

[5]    The hearing officer credited the testimony of an expert that Independence Academy had exaggerated the "breaking table" incident.  Child had placed his head on his desk tabletop, and that action had caused the legs on the old desk to buckle.

[6]    The May 1 IEP provided for the Homebound services through May 31; the later May 25 IEP removed that date restriction.

With respect to residential or day placement, Mother expressed her opposition to residential placement and her strong preference for a day placement and explained (along with an expert Mother brought to the CCC) that Child's therapist agreed with that assessment and that residential placement could be detrimental to Child. The School provided Mother with written releases (to share its information about Child's medical, educational, and dietary experiences) with three schools. All three schools offered residential placement, though one of them, T.C. Harris School & Academy in Lafayette, Indiana, also offered day placement. Mother identified two additional day placements, in the Indianapolis/Carmel area, for investigation.  The School did not seek releases to obtain information from Child's therapist, other medical providers, or his employer, and it did not speak to any of these persons. The School told Mother that "[i]n the event that a day placement cannot be found but a residential placement is accessible, the CCC will discuss this placement," and Mother believed the School would look for day placement.  The May 1 IEP scheduled a second CCC for May 25, 2018.

Before the May 25 CCC, (a) two of the three residential placement facilities identified by the School indicated Child was not appropriate for their facilities and (b) one of the day placements identified by Mother stated its facility was not appropriate and the other stated it would need to meet with Child and Mother for assessment before making a decision. The one remaining facility identified by the parties at the May 1 CCC was T.C. Harris. No other facilities apparently were identified by the School, either day or residential placement, at any other time.

Two days after the May 1 CCC, the School emailed the director of admissions at T.C. Harris and attached the May 1 IEP and the release form.  T.C. Harris responded by email to the School on May 21, 2018, that residential spots were not available at that time, but there were immediate openings in the day program "if the case conference committee is willing to consider another try at day services," and pointed out it had "noted in [the] IEP that his mother's preference is for day programming."

On May 22, 2018, the School emailed Mother a link to Facebook reviews of T.C. Harris but did not mention that one day earlier, T.C. Harris had said there was a spot for Child in its day program. On May 23, 2018, the School responded to T.C. Harris's May 21 email advising that an opening was available in its day program, stating that the School's representatives (Jay Arthur, the Director of Student Services and Tamara Thornbury, the Assistant Director of Special Education) were not interested in the day program but would be interested in residential placement in August if a spot opened up:

> Thanks for getting back to me.  I shared with [Jay Arthur and Tammy Thornbury] and they are not interested in the day treatment.  They are meeting on Friday to discuss options.  At this point they would be interested in a [residential] placement in August and understand that there is a waitlist.

The School did not share with Mother at the May 25 CCC that it had told T.C. Harris it was not interested "in the day treatment" and "would be interested" in residential placement beginning in August.  The School did not share with Mother at the May 25 CCC that T.C. Harris had told the School that day placement

was immediately available. The School also did not share with Mother at the May 25 CCC that T.C. Harris had told the School by that date (according to testimony by a T.C. Harris representative at the hearing) that its residential program could not meet Child's needs because of his unique dietary and medical requirements.

Compounding these omissions, the School told Mother instead that T.C. Harris had accepted Child into its residential program though he was waitlisted until August. When Mother asked why no day placement had accepted Child, the School did not reveal that T.C. Harris had space available in its day program but instead gave reasons why Child had not been a fit for the day programs that were investigated:

> [Ms. Thornbury] explained the reasoning why a student may not be accepted into a program based on their structure—frame of treatment, current caseload, or services available. In [Child's] case he did not fit the day programs' frame of treatment or the group of students that are currently 'enrolled.'[7]

Notes from the May 25 IEP reflect that Mother continued to be opposed to residential placement and believed it would be harmful to Child, and the School continued to push residential placement and believed it would be the best course of action. Indeed, the Assistant Director for the School testified at the hearing that she would not look very smart by continuing to offer the same placement for Child (day placement) "because repeating the same thing and expecting a different result

---

[7]     Even though the School indicated Child did not fit any of the investigated day programs, it did not yet know whether the remaining day program identified by Mother had made its decision (and it knew that T.C. Harris said openings were available in its day program).

16

is the definition of insanity."  At the end of the meeting, Mother and Ms. Thornbury talked about scheduling a visit to T.C. Harris over the summer.  The School did not schedule a date for a mutual visit.  Sometime during the summer, Mother visited T.C. Harris by herself.

On June 1, 2018, Mother filed a Section 7 request for an administrative hearing, based primarily upon the School's expressed intent to place Child in a residential placement and Mother's view that Child "simply needs an appropriate educational and behavioral day program."  In June 2018, Child began receiving services from Autism Parent Care, an ABA-therapy facility in Carmel.  At this point, Mother reported that Child needed "moment-to-moment" supervision. After an initial assessment and several observation visits conducted by the facility's Clinical Director, a certified behavior analyst, the facility stated in early July that it could not serve Child. The Clinical Director stated that Child has irrational fears, has demonstrated self-harm behaviors, needs a place "where he cannot just run out into the street," and a residential placement is appropriate.

 The hearing officer's decision, which credited testimony by Mother and her expert witnesses, reflected a different view of Child and his ability to respond to appropriate and intensive therapy and other services. The decision reflects her overall assessment that the School wholly failed its duties to implement, oversee, and otherwise monitor an appropriate IEP and services to Child at Independence Academy from January through April 2018.  She concluded there were numerous and serious failures by the School, and specifically "held" that Child's "behavior had

a direct and substantial relationship to the student's disability *and* was a direct result of the [School's] failure to implement the [January 2018] IEP." (Emphasis in original.)

After Mother's June 1, 2018 filing for a due process hearing, the parties participated in prehearing conferences with the hearing officer and, ultimately, agreed on issues for the hearing and dates for the hearing. The hearing officer identified seven issues and ruled in favor of Mother on six of them. She ordered the School to (a) convene a CCC, (b) develop an IEP with appropriate curriculum, academic goals, computer technology assistance and training, transportation services as necessary, social skills and behavior coaching and services, and other community involvement and vocational services to advance Child's post-secondary goals, (c) prepare a new Functional Behavioral Assessment and Behavioral Intervention Plan, (d) pay for an Independent Educational Evaluation, (e) provide six months of compensatory education services at a place chosen by Mother, (f) pay for 10 hours of training for Mother, and (g) provide training to its special education staff and administrators about state law requirements and working with students with autism. Finally, the hearing officer ordered that Child be placed at Changing Lives Behavioral Services at the School's expense (a place Child began receiving services in mid-September 2018), and for the School to provide a licensed teacher to deliver academic instruction at least eight hours per week for a minimum of 24 months, and longer as appropriate to allow Child to graduate with a general diploma.

## Analysis

The School challenges the hearing officer's conclusions that it did not provide the Child with a free appropriate public education since January 1, 2018, for reasons listed below, or a free appropriate public education since April 2018, for reasons listed below. The two issues can be summarized as follows:

1.      The hearing officer decided that the School had failed to provide Child with a FAPE since January 1, 2018, because the School did not provide Child (a) with a "fully-compliant transition and transition IEP" and (b) special education and related services during removals.  The School contends this finding cannot be sustained by the record and applicable law.

2.       The hearing officer decided that the School had failed to provide Child with a FAPE since April 2018 because the School's subsequent IEPs (dated May 1, 2018, and May 25, 2018) (a) did not cover all of Child's needs and was not reasonably calculated to provide meaningful education benefit, (b) did not provide for education in the least restrictive environment, (c) did not consider placement options other than residential placement, and (d) was contrary to transition planning because of the proposed residential placement. The School contends this finding cannot be sustained by the record and applicable law.

**I.      The hearing officer's decision that the School had not provided a FAPE since January 2018 is supported by substantial evidence and <u>is not contrary to law.</u>**

The January 19, 2018 IEP covered the period Child was placed at Independence Academy.  The record, and the hearing officer's findings of fact and conclusions of law, reflect that Child's placement at Independence Academy was a disastrous experience, seemingly for all parties concerned.  But the hearing officer, rightly, placed the blame on the School—not on Mother and perhaps not even on Independence Academy.

The January IEP was intended to be short-lived, and it lacked academic goals and details about the services to be provided for meeting the goals.  The lack of specificity was deliberate because Child was in a "probationary period" at Independence Academy, and it needed to "get to know" Child.  The IEP provided that a CCC was needed within 6-8 weeks for reassessment.  But it never happened, and the hearing officer's determination that the School was blameworthy for the failure timely to hold a CCC, no later than six to eight weeks after January 19, and to prepare an appropriate IEP finds significant support in the record.  There is no evidence that the School even mentioned scheduling a CCC until after Mother had email correspondence with Independence Academy on March 20 because Child was being suspended for "incredibility disrespectful and disruptive" behaviors, and the following day, Mother and School had an email exchange about discussing Child's behavioral levels. At that time (already past the six-to-eight week period), the School suggested convening a CCC but also said (in response to Mother's indication

she just wanted a meeting to discuss Child's behavioral levels) that "we do not have

to go through the whole IEP or make it a big 'to do,'" but should use the CCC

format.  Mother then indicated that she could be ready to participate in a CCC after

spring break, and the parties scheduled one for May.

As the hearing officer found, the School could have scheduled a CCC much

earlier and within the six to eight-week period, and the information available to it

about Child's experience at Independence Academy should have prompted it to do

so.  According to the record and the hearing officer's findings, in the month of

February alone, Child had served four days of in-school suspension, two days of out-

of-school suspension, and was removed from the classroom on six other occasions

because of behavior. And even though the School's autism specialist (Mr. Piper) had

access to Child's records (and was specially provided with "incident" reports that

reflected serious behavior issues), was charged with training and supervising the

one-on-one aide who worked with Child (and thus presumably gathered information

from the aide about Child), and was charged with working with Child (he went one

day per week to Independence Academy for training and supervision), the School

did nothing until late March even to attempt to convene a CCC (or meeting) for

addressing Child's behavioral issues and his academic progress (or lack thereof).

Other information in the record convinced the hearing officer that the School

essentially had "parked" Child at Independence Academy and was not aware of, or

chose not to address, important information about whether Child was actually

receiving the special education and related services he was to receive.  The School

provided no evidence about the qualifications or experience of Child's one-on-one aides and no evidence about the content of the training and supervision the School provided those aides. The School did not know about the licensure of the teachers who provided academic instruction to Child and did not know only one of them maintained a current license and one had never had a teaching license. Despite the fact the January IEP provided for eight hours per day of educational services, Child attended Independence Academy only half-days, and the School did not provide any supplementary related services, such as counseling.

Nor was it error for the hearing officer to award additional educational benefits because of the extent of "removals" of Child while at Independence Academy, especially when taken into account with his receipt of only half-day services and not the eight hours per day of services the IEP directed. Her detailed calculations regarding removal periods and explanation why she deemed them removals support her decision to award six months of compensatory education services.

The hearing officer's conclusion that the School's failures, as described above, and the extent of removals led to the denial of a FAPE to Child since January 2018 is well-supported by the evidence. The court finds no basis for overturning that decision.

II.     **The hearing officer's decision that the School had not provided a FAPE since May 2018 is supported by substantial evidence and is <u>not contrary to law.</u>**

As noted above, the hearing officer gave several reasons, individually and collectively, why she found the School had not provided a FAPE since May 2018. Three relate to residential placement. The other concerns the hearing officer's determination that the School did not, in its May IEPs, adequately develop goals for Child and then develop an IEP consistent with providing services to permit Child reasonably to achieve his goals.  The court first addresses the latter and then addresses the findings relating to residential placement.

A.     **The hearing officer's determination that the May 2018 IEPs were not reasonably calculated to provide an educational benefit is supported by substantial evidence.**

The court first rejects the School's argument that Mother cannot prevail on a claim that the May 2018 IEPs were not reasonably calculated to provide an educational benefit because she signed the May 1, 2018 IEP and thus agreed to the educational services provided over the summer to Child as reflected uniformly in both May IEPs.  First, the parties agreed that an issue before the hearing officer was whether the May 2018 IEPs were reasonably calculated to provide meaningful educational benefit.  Second, the cases cited by the School to support its argument Mother forfeited a right to challenge the education services aspects of the May 2018 IEPs do not hold that a parent forfeits her right to challenge an IEP when she timely files for an administrative due process hearing.  *See White v. School Bd. of Henrico Cty*, 549 S.W.2d 16, 25 (Va. App. 2001) (court found it inequitable for

parent to challenge IEP as failing to provide FAPE, requiring school to reimburse private tuition, when she signed the IEP without having attended the CCC and then waited a year and after her child had attended a private school to object to the IEP); Independent Sch. Dist. Num. 432 v. J.H., 8 F. Supp. 2d 1166, 1172-74 (D. Minn. 1998) (finding that because the school had revised the IEP and parents no longer objected to it, their dispute was not ripe). No one suggests Mother did not timely assert her due process rights.

On the merits, the court determines that the hearing officer's decision that the May IEPs were not reasonably calculated to provide meaningful educational benefit is supported by substantial evidence. The School defends the educational benefit under the May IEPs (special education services for three hours/two times per week at Carmel High School Learning Center and 20 hours of extended school year services during the summer) as appropriate because it was providing only for "gap" services from the end of Child's placement at Independence Academy to the beginning of a new placement in the late summer. The hearing officer's reasons for rejecting the School's "gap" justification are rational and supported, and one of them is sufficient by itself. The education benefit in the January IEP itself was a "gap" proposal that was intended to be updated when Independence Academy got to know Child better. But Child's education goals and objectives were never updated, and a program to achieve those goals was never specified. The May 2018 IEPs did not have any math, reading, or writing goals (and neither did the January IEP), and it provided only for 6 hours of "special education services," without any information

24

about the nature of the education. Because of the lack of information and continued use of "gap" goals, the hearing officer did not err in determining that the May 2018 IEPs did not provide meaningful education benefit. *See Endrew F.*, 290 F. Supp.3d 1175 (D. Colo. 2018) (or remand from Supreme Court) (carrying over same basic goals is not consistent with providing a FAPE).

### B. The hearing officer's determination regarding residential placement is supported by substantial evidence.

The hearing officer determined that the School did not consider placement options other than residential placement, or that it "predetermined" residential placement. She also found that selecting residential placement did not provide an education for Child in the least restrictive environment (or "LRE"), and it was not consistent with transition planning.

Sufficient evidence supports the officer's findings that the School predetermined residential placement and that it was not the least restrictive environment.  Article 7, at 511 IAC 7-42-10(b)(4), defines a continuum of placements from least to most restrictive and, as one might surmise, a nonresidential school that provides special education and related services is less restrictive than a residential school that provides education and services to students who live at the school.  The only more restrictive placement than residential school placement is a hospital, the student's home, or some other noneducational site. In addition, in choosing the LRE, the School must consider whether the chosen environment potentially will have a harmful effect on the child or the quality of the services the child needs.  34 C.F.R. § 300.116(d); 511 IAC 7-42-10(a)(5).  Though the

25

School insists that it could not have predetermined residential placement because it was in the process of evaluating placements after the May 1 and May 19 CCCs, the hearing officer was not required to accept at face value the May 19 IEP's comments that the School merely believed residential placement was the right choice and that it was still investigating non-residential opportunities.  The School's internal emails and its actions at the May CCCs demonstrate otherwise, or at least the hearing officer was entitled to interpret them as strong evidence of predetermination:  The School prepared releases only for schools that offered residential placement and expressed to T.C. Harris it was investigating residential placement; T.C. Harris told the School that it had noticed that mother wanted day placement and it had an opening for day placement but not residential placement until at least late summer; the School told T.C. Harris it was not interested in day placement; the School did not reveal to Mother that T.C. Harris had a day placement immediately available, while continuing to tout T.C. Harris as a residential placement option; the School did not seek to obtain further information from Child's therapists and medical providers about concerns that residential placement would be harmful to Child; and the School's witness testified that it would not be very smart to continue to offer the same placement (day placement) "because repeating the same thing and expecting a different result is the definition of insanity."  The hearing officer was convinced, based on all the evidence, that predetermination had occurred and that the School was highly motivated to make that predetermination.  The officer found that the School was aware that if it created an IEP providing for residential placement,

Mother "would exercise her option to withdraw her son from school and homeschool him.")

The officer's determination that residential placement was not consistent with transition planning is also supported.  She found that for Child, at his age and stage, residential placement was "contrary to effective transition planning" because removing Child completely from his community would cause him to regress, "could potentially destroy him," and would remove the support systems (the community where he held a job, visited his medical providers, and participated in activities) that minimize the behaviors that interfere with his development.

Given the court's standard of review, it upholds the hearing officer's determinations that the School failed to consider placement options other than residential, failed meaningfully to evaluate harm to Child from a residential placement, and that such placement violated LRE requirements and effective transition planning. These combined failures denied Child a FAPE, or at least substantial evidence supports the hearing officer's conclusions that they did.  *See Nack ex rel. Nack v. Orange City School Dist.*, 454 F.3d 604, 609 (6th Cir. 2006) ("Predetermination amounts to a procedural violation of the IDEA.  It can cause substantive harm, and therefore deprive a child of a FAPE, where parents are 'effectively deprived' of 'meaningful participation' in the IEP process."); *Yankton Sch. Dist. v. Schramm*, 900 F. Supp. 1182, *aff'd*, 93 F.3d 1369 (8th Cir. 1996) (finding that failure to provide transition services constituted denial of a FAPE).

## III.   Mother is entitled to her attorneys' fees.

Because the court has sustained the hearing officer's decisions that the

School did not provide Child with a FAPE since January 2018 and since May 2018,

the court determines that Mother is a prevailing party entitled to fees under the

IDEA. *See Bingham v. New Berlin School Dist.*, 550 F.3d 601, 603 (7th Cir. 2008).

Mother must file her petition for fees within 28 days of the entry of this order. The

School's response brief is due 28 days thereafter, and Mother may file a reply brief

within 14 days.

## <u>Conclusion</u>

For the foregoing reasons, the court DENIES the School's motion (Dkt. 44) for

summary judgment and GRANTS Mother's motion (Dkt. 47) for summary

judgment.

So ORDERED.

Date: 6/1/2020

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system